**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KAITLIN GRIFFITH<br>3304 Schindler Drive<br>Mount Laurel, NJ 08054 | : <br> : <br> : <br> : | CIVIL ACTION |
| Plaintiff,<br>v. | : <br> : <br> : <br> : | No.: _____ |
| WOUND CARE CONCEPTS, LLC, d/b/a<br>GENTELL WOUND MANAGEMENT<br>1000 Floral Vale Boulevard<br>Yardley, PA 19067<br>        and<br>GENTELL, LLC, *formerly Gentell Inc.*<br>1000 Floral Vale Boulevard<br>Yardley, PA 19067 | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| Defendants. | : <br> : <br> : | |

**CIVIL ACTION COMPLAINT**

Plaintiff, Kaitlin Griffith, by and through her undersigned counsel, hereby avers as follows:

**I.      INTRODUCTION**

1.      Plaintiff has initiated this action to redress violations by Wound Care Concepts, LLC and Gentell, LLC (hereinafter collectively "Defendants") of the Family and Medical Leave Act ("FMLA" – 29 U.S.C. §§ 2601, *et. seq.*) and other applicable state laws. In particular, Plaintiff alleges that she was wrongfully terminated by Defendants (and denied state and federal leave entitlements).

**II.      JURISDICTION AND VENUE**

2.      This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3.    This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.    Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants  residents of the District of New Jersey.

### III.    PARTIES

5.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.    Plaintiff is an adult individual, with an address as set forth in the caption.

7.    Wound Care Concepts, LLC, d/b/a Gentell Wound Management ("Defendant WCC") is a domestic limited liability company incorporated in Pennsylvania in 2005. This entity is a vertically-integrated wound care company selling and providing medical devices, dressings, cleansers, and skin care products (among other offerings) to nursing homes, hospices, and hospitals (among other facilities). In or about June of 2023, Defendant registered its fictitious business name of "Gentell Wound Management" (a name utilized publicly by Defendant WCC for its enterprise). Defendant WCC is headquartered at the above-captioned address.

8.    Gentell, LLC, formerly Gentell, Inc. ("Defendant Gentell") is a domestic limited liability company incorporated in Pennsylvania in 1995. This is a wound care and medical device

2

company. Defendant Gentell is headquartered at the above-captioned address and operates publicly as "Gentell."

9.    Defendants WCC and Gentell operate from the same address, utilize overlapping oversight and management, and function as *the same* enterprise. They utilize overlapping marketing, management, controls, staff, and resources. They are for all purposes properly considered Plaintiff's single, joint and/or integrated employers.

10.    At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## IV.    **FACTUAL BACKGROUND**

11.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

12.    Plaintiff was offered employment by Defendants in or about late August of 2024, and Plaintiff commenced employment with Defendants on or about September 16, 2024.

13.    Plaintiff, a Registered Nurse ("RN"), worked for Defendants as a Wound and Product Specialist. Plaintiff was primarily a "field" employee for Defendants (with her role outlined in more detail below).

14.    Although Defendants are headquartered in Pennsylvania, the venue of this case within New Jersey is proper for many reasons including but not limited to *inter alia*:

    (1) Plaintiff resides in New Jersey and regularly worked from her residence in New Jersey for Defendants.

    (2) Plaintiff's sole geographic territory while in the employ of Defendants was in Southern New Jersey (as Defendants have a large presence of business in and clientele in New Jersey).

(3) Plaintiff regularly traveled to and from work in New Jersey to Defendants' clients (and in fact worked near exclusively in New Jersey).

(4) Defendants have engaged substantial clientele in New Jersey, and Plaintiff rarely commuted to or traveled to Pennsylvania. In fact, Plaintiff estimates that she performed 99% of her job in New Jersey (at her residence, working for Defendants' clients in New Jersey, and traveling for work in New Jesey).

15. At all relevant times, Plaintiff's immediate manager was Matthew Brotz ("Brotz"), a Regional Manager of Defendants. Brotz has upon information and belief worked for Defendants for approximately twenty (20) years.

16. Plaintiff was involuntarily terminated by Defendants on or about January 6, 2025, after approximately 16 months of employment (discussed more *infra*).

17. Plaintiff has an 8-year-old daughter, and Plaintiff is a single mother who worked full-time for Defendants.

18. Starting in or about July of 2025, Plaintiff's daughter became very ill, was having severe medical complications, and was enduring uncontrolled diabetic problems or diabetic-related flareups (among other health issues). As a result, Plaintiff had to provide *very substantial* medical care and oversight to her daughter. Plaintiff was *very transparent* with Brotz about her daughter's state of affairs (relative to her health).

19. During Plaintiff's first year of employment, she performed her role in an exemplary manner, was never warned or disciplined, and met or exceeded expectations in all facets of her role. Moreover, she enjoyed a good working relationship with Brotz (prompting in large part her aforesaid transparency).[1]

20. During Plaintiff's last approximate 3-5 months of employment, her relationship with Brotz was changing for the worse. She was relaying need for time off to care for her

---

[1] To be clear, Plaintiff continued to perform her job well even through termination. But Brotz (as explained herein) used discipline to discourage FMLA usage.

daughter medically, and Brotz was admonishing that such time was not feasible or possible in her role and in light of the company staffing.

21.    Plaintiff discussed her need for time off to care for her daughter with Brotz on numerous occasions during her last 3-5 months of employment. Plaintiff was specifically bringing up to Brotz that she believed she needed and wanted to take time off under the Family and Medical Leave Act ("FMLA"). During these discussions, Plaintiff was becoming and/or was an FMLA-eligible employee having worked for Defendants for at least one (1) year.[2]

22.    Defendants worked with what would proverbially be referred to as skeletal staffing (who were *relentlessly overworked*). Plaintiff was assigned a geographic territory, and she was responsible for selling, ordering, managing, and responding about or concerning accounts and products with many medical facilities.

23.    When Plaintiff was bringing up that she needed to care for her daughter and use FMLA, Brotz was telling Plaintiff things like: (a) you cannot take time off; (b) we do not have coverage for you; (c) we need you in the field; (d) if you take any time off, our company is not paid on your accounts; (e) FMLA is not option in your job; (f) there is nobody else to handle your accounts and (e) and a host of other statements or comments discouraging and interfering with Plaintiff using FMLA (or taking time off to care for her daughter).

24.    In addition to direct commentary rejecting or discouraging use of FMLA by Plaintiff, Brotz issued Plaintiff a disciplinary warning. The discipline issued by Brotz in the October-November 2025 was a clear message that Plaintiff faced potential termination if she further sought leave under the FMLA.

---

[2] Plaintiff also sues herein for violations of the NJ FLA. Plaintiff omits reference herein of that law because protections mirror those of the FMLA (but have less stringent qualifying requirements). Plaintiff does however assert such violations in the Count Section of this lawsuit.

25.    The protections against FMLA interference are <u>very</u> broad (and protective of employees). In *Ziccarelli v. Dart*, 35 F.4th 1079, 1086 (7th Cir. 2022), the court (referencing national case law uniformly) explained:

(1) Actual application for or denial of FMLA leave is not required to sue for violations of the FMLA, but rather, *any discouragement or interference* with discussions of FMLA <u>will constitute a violation of the FMLA</u>, citing § 2615(a)(1);

(2) An employee engages in protected statutory activity by making a mere request for time off for an FMLA qualifying reason, *even if he or she does not mention the term "FMLA"* (*See Id*. at 1086.); and

(3) The Court in Ziccarelli (citing many other similar decisions) held that any form of discouragement of FMLA warrants a jury trial where the employee should have been permitted to use (or needed) FMLA (and such conduct can also constitute a viable retaliation claim).

26.    Plaintiff raised requests for usage of leave for her child on <u>numerous</u> occasions intermittently or otherwise (and was expressly talking with Brotz about "FMLA"), she was disciplined, and she was discouraged in many different comments suggesting she could not take such time off from work or that she would face termination.

27.    In the interest(s) of providing more particularity, this was Plaintiff's work situation (which Brotz was relaying her inability to take FMLA about):

- Plaintiff was typically assigned roughly 30-40 medical facilities to handle in the Southern, New Jersey territory she was assigned.

- Defendants' revenue generation was directly dependent upon the medical facilities to which Plaintiff was assigned. Plaintiff was to handle all new orders, custom orders, and any other devices or products needed by each facility each month.

- Plaintiff had approximately 20 calendar work days (per month) to handle all ordering for each facility. This means Plaintiff at times *needed to attend 2-3 facilities per day* where she could spend up to 3-5 hours per facility.

- All orders for each facility needed to be completed per month within approximately 20 work days. In addition to Plaintiff having to meet, review, and

order within such facilities - - Plaintiff also had to answer all questions, do research, respond to emails, and provide information as requested to each medical facility.

- If Plaintiff missed a single day from work, Defendants had no operating procedure for coverage nor any contingency plans (as to Plaintiff). Instead, Plaintiff's assigned medical facilities would have to wait for a response from Plaintiff the following day or days later.

- If Plaintiff was unable to work for any period of time, Defendants had no operating procedure for coverage nor any contingency plans to handle Plaintiff's in-person appearance(s) or ordering within deadlines.

- Plaintiff was working very long hours to keep with Defendants continually adding responsibilities to her, and she was working on a proverbial island handling her assigned clientele with no actual or adequate support.

28. Plaintiff offered to get medical documents or FMLA forms filled out trying to give Brotz time to layer in support or coverage for Plaintiff (even offering to get FMLA forms from her daughter's endocrinologist), but Plaintiff was struggling caring for her daughter and trying to work until 2 – 4 AM in various mornings trying to keep up with her workload around care for her daughter.

29. Plaintiff was informed that she was being terminated for performance reasons on or about January 6, 2026. This termination was communicated to her by Flora (an HR person, name spelled phonetically) and Brotz.

30. During her termination, Plaintiff adamantly protested that she believed she was terminated for issues relating to having to balance care needs of her daughter. In the presence of Flora, Brotz admitted and stated, "all of your performance problems did start when your daughter became ill." He made other similar admissions as well, acknowledging he associated Plaintiff's performance decline with Plaintiff's need to take care of her daughter.

7

31.    Plaintiff's rights under the FMLA were violated in three (3) ways:

(1) Plaintiff's rights to use FMLA were interfered with and discouraged unlawfully.

(2) To the extent that Plaintiff's performance did suffer or wane in any manner (which culminated in her termination), Plaintiff was solely terminated as a result of being deprived of the ability to take FMLA leave (constituting an unlawful termination from employment).

(3) Plaintiff engaged in statutorily protected activities by seeking FMLA and asking to take FMLA from Brotz. When Plaintiff was terminated, ***she was still performing in the top 25% of salespeople in comparable positions*** (and in some metrics far more superior than even the top 25%). Thus, it was not really her performance, but rather, the protected activities of continually seeking or requesting FMLA that resulted in Plaintiff's retaliatory termination from employment. She was not a bad performer. She was not an average performer. She was a very good performer and well above average (but other underperformers were retained).

32.    Plaintiff complained about her termination and requested that human resources have the matter escalated to higher management. Plaintiff's termination was nonetheless confirmed by Dina Pescatore (Vice President of Human Resources). But there had been no meaningful investigation, Plaintiff was not interviewed, and Plaintiff's performance data was likely not reviewed. Instead, upon information and belief, Pescatore merely rubber-stamped a discriminatory interference-related, and retaliatory termination of Plaintiff.

33.    Brotz in essence kicked Plaintiff to the curb after developing a good relationship with her because of Plaintiff's FMLA or FLA needs and/or because he associated Plaintiff as being too distracted to continue working effectively in light of her daughter's medical conditions (and care needs).

**First Cause of Action**
**Violations of the Family and Medical Leave Act ("FMLA")**
**([1] Interference & [2] Retaliation)**

34.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

35.     Plaintiff was an eligible FMLA employee, and the actions taken against her as outlined in his lawsuit constitute interference, discrimination, and retaliation in violation of the FMLA.

**Second Cause of Action**
**Violations of the New Jersey Family Leave Act ("NJ FLA")**
**([1] Interference & [2] Retaliation)**

36.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

37.     Plaintiff was an eligible NJ FLA employee, and the actions taken against her as outlined in his lawsuit constitute interference, discrimination, and retaliation in violation of the NJ FLA.

**Third Cause of Action**
**Violations of the New Jersey Law Against Discrimination**
**(Associational Discrimination)**

38.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

39.     Brotz's actions and commentary indicated he was terminating Plaintiff out of concern she was too distracted by care for her daughter due to her daughter's medical disabilities / conditions.

40.     In *Thompson v. MaineHealth,* 656 F. Supp. 3d 251, 256 (D. Me. 2023), the court explained: "Associational discrimination occurs when 'the employer fears that the employee will

9

be inattentive at work due to the disability of the disabled person,;" citing, *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016); *see also Aguirre v. Mayaguez Resort & Casino, Inc.,* 59 F. Supp. 3d 340, 349 (D.P.R. 2014)("An [adverse action against an] otherwise qualified applicant or termination of an employee, based on a belief that the individual would be distracted or miss work to care for a disabled relative, are examples of actionable conduct under the association provision.").

41.      Plaintiff in fact performed her job well and above her peers, but she was terminated based upon such associational discrimination perceptions. The NJ LAD and ADA are interpreted identically in their respective protections. Plaintiff's termination therefore constitutes a violation of the NJ LAD.

## Fourth Cause of Action
## Violations of the New Jersey Wage Payment Law ("NJWPL")
### (Non-Payment of Wages)

42.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

43.      Plaintiff was not paid in excess of 80 hours of PTO time she accrued and was unable to use during her employment due to her job requirements. Plaintiff was not paid for such compensation in her final paycheck.

44.      Defendants' failure to properly pay Plaintiff all monies owed as of termination and in her next payroll thereafter constitutes a violation of NJWPL.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.      Defendants are to promulgate and adhere to a policy prohibiting discrimination / interference / retaliation in the future against any employee(s);

10

B.      Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, and benefits;

C.      Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by Defendants' actions;

D.      Plaintiff is to be awarded liquidated and punitive damages as permitted by applicable laws herein;

E.      Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate;

F.      Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law; and

G.      Plaintiff is to receive a trial by jury as set forth in the caption of this Complaint.


Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**


By:  _____
Ari R. Karpf, Esq. (021842003)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
akarpf@karpf-law.com
(215) 639-0801

Dated: February 10, 2026


11